UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| WILLIAM HUBBARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:19-cv-00001-JRS-DLP |
| ) | |
| WEXFORD HEALTH SOURCES, INC, et al. ) | |
| ) | |
| Defendants. ) | |

**Order Granting Summary Judgment for Defendants
and Directing Entry of Final Judgment**

William Hubbard, an inmate at Wabash Valley Correctional Facility ("WVCF"), brought this civil rights action pursuant to 42 U.S.C. § 1983. The plaintiff's claims arise from medical treatment he received for an ocular disorder resulting in blurred vision in 2018. He alleges the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[1]

The defendants—Dr. Dennis Lewton, Dr. Samuel Byrd, Nurse Amy Wright, Nurse Kim Hobson, Wexford of Indiana, LLC ("Wexford of Indiana"), and Warden Richard Brown—have moved for summary judgment. For the reasons explained below, the defendants' motions for summary judgment are **granted**.

---

[1] Although the plaintiff also raises claims under the Indiana Constitution in his second amended complaint, he has failed to delineate these claims in opposition to the defendants' motions for summary judgment. Accordingly, any state law claims are deemed abandoned. *See Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) ("because [the plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned."); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir.1999) (stating that arguments not presented to the district court in response to summary judgement motions are waived).

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a). A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Indiana*

*University*, 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

## II. Factual Background

1. <u>The Parties</u>

Plaintiff William Hubbard has been an inmate at WVCF since 2012. Dkt. 96-4, p. 7. He brings this action alleging deliberate indifference to his serious medical needs by Wexford of Indiana, LLC, Wexford's employees, and WVCF Warden Richard Brown. Dkt. 35.

Defendant Dr. H. Dennis Lewton, O.D., is an optometrist licensed to practice optometry in the State of Indiana. Dkt. 96-2, para. 3. Since 2011, Dr. Lewton has provided optometry services to patients at WVCF. Dkt. 96-5, no. 2. Dr. Lewton is physically present at WVCF approximately two days per month to see patients. *Id.* at no. 4.

Defendant Dr. Samuel Byrd is a physician licensed to practice medicine in the State of Indiana. Dkt. 112-1, para. 1. At all times relevant to the Plaintiff's Complaint, and currently, he was employed by Wexford of Indiana as an onsite physician at WVCF. *Id.* at para. 2.

Defendant Amy Wright is a registered nurse licensed in the State of Indiana. Dkt. 112-3, para. 1. At all times relevant to this action, and currently, she was employed by Wexford of Indiana as the Director of Nursing at WVCF. *Id.* at para. 2. In this role, she oversees the provision of nursing services at WVCF. *Id.* at para. 4. She is also tasked with reviewing and responding to the inmates' informal medical grievances. *Id.* To her knowledge, Ms. Wright has not provided nursing services directly to the plaintiff. Instead, her only interactions with the plaintiff were through letters and informal grievances. *Id.* at para. 3.

Defendant Kim Hobson is a registered nurse licensed in the State of Indiana. Dkt. 112-2, para. 1. At all times relevant to this action, she was employed by Wexford of Indiana as the Health

Service Administrator at WVCF. *Id.* at 2. Ms. Hobson oversees the provision of medical services generally at the facility, ensures compliance with IDOC directives, responds to letters, responds to inquiries on behalf of the medical department, and ensures that patients have access to the care they need. *Id.* at para. 4. Ms. Hobson is also tasked with reviewing and responding to inmates' medical grievances. *Id.* To her knowledge, Ms. Hobson has not provided nursing services directly to the plaintiff. *Id.* at 3. Instead, her only interactions with the plaintiff have been through letters and formal grievances. *Id.*

Defendant Richard Brown was the Warden of WVCF at all times relevant to this action. Dkt. 44, p. 2.; dkt. 104-1, para. 1.

2. Histoplasmosis, Retinal Damage, and Visual Disturbances

*Histoplasmosis capsulatum* is a fungus commonly found in the soil in river valley regions in the midwestern United States. Dkt. 96-3, para 6. It is associated with bird droppings, particularly those of pigeons and chickens. *Id.* Infection can result when histoplasmosis spores are inhaled, however most patients who inhale histoplasmosis spores experience no symptoms. *Id.* Approximately 60% of the U.S. population tests positive to exposure to histoplasmosis. *Id.*

Exposure to histoplasmosis can result in ocular conditions in a very small minority of persons. *Id.* Histoplasmosis spores that are inhaled can spread through the bloodstream to the eyes, where they encyst and lie dormant. *Id.* The spores can result in the formation of scarring to the retina. *Id.* Presumed ocular histoplasmosis syndrome (also known as "POHS") is a disease characterized by the presence of small, oval, punched-out atrophic scars in the ocular fundus occurring in the absence of inflammation in the eye. *Id.* at para. 7. Over time, the scarring can sometimes result in new blood vessel growth to the retina, known as choroidal neovascularization ("CNV"). *Id.* In some circumstances, patients with CNV can develop the leakage of fluid from the vessels in the

retina, resulting in retinal edema and sometimes retinal detachment. *Id.* However, the vast majority of patients exposed to histoplasmosis, including those with retinal scarring, do not experience CNV or loss of vision. *Id.*

There is no systemic treatment available to treat POHS. *Id.* at para 8. That is to say, there is no pill or other medication that can be given orally or intravenously to treat POHS or to eliminate the histoplasmosis spores that may have encysted in the eyes. *Id.* Chest x-rays and skin tests are of no value in the diagnosis and treatment of POHS. *Id.*

Annual examinations are recommended for patients with evidence of histoplasmosis scarring for the purpose of checking for CNV. *Id.* If patients develop ocular manifestations of POHS such as the loss of vision, retinal edema, or CNV, the condition can be treated by laser, surgery, or the injection of anti-Vegf medications such as Avastin directly into the eyes with a needle. *Id.* Patients who have POHS but have no loss of vision, retinal edema, or CNV are monitored, only, and do not receive any treatment. *Id.* The only treatments available for POHS—such as surgery, lasers, and eye injections—carry risks. *Id.* These treatments are not performed unless there is evidence that active POHS is causing significant problems. *Id.*

3. The Plaintiff's Treatment during his incarceration at WVCF

Prior to the events of August 2018, the plaintiff was diagnosed with borderline diabetes, hypertension, and hyperlipidemia. Dkt. 112-1, para. 4. He was enrolled in the chronic care clinic at WVCF, which required that he be seen regularly by medical staff, including defendant Dr. Byrd, every few months for testing or blood work to monitor progression of his disease and ensure he received instruction and medication for management of his chronic conditions. *Id.*

Dr. Lewton saw the plaintiff for eye exams on May 11, 2012; April 13, 2013; June 18, 2014; September 15, 2014; September 13, 2015; October 5, 2016; and December 6, 2017. *Id.* at

paras. 5-12; dkt. 96-8, pp. 1-10. The plaintiff did not exhibit significant problems with his vision at any of these exams. Dkt. 96-4, pp. 67-68, 71-72. During that time, the plaintiff's uncorrected visual acuity was consistently 20/20 or 20/25. Dkt. 96-2, paras. 5-12. Because the plaintiff is a diabetic, Dr. Lewton routinely examined his eyes and vision for diabetes-related conditions. Dkt. 96-2, para. 5.

On June 18, 2014, Dr. Lewton's examination revealed some small areas of scarring in the retina consistent with POHS. Dkt. 96-2, para. 7. Dr. Lewton advised the plaintiff of his findings and told the plaintiff to return to monitor the stability of the POHS scarring. *Id.* On September 15, 2014, the plaintiff returned for a follow-up examination with Dr. Lewton. *Id.* at para. 8. Dr. Lewton noted that the POHS scarring was stable and the plaintiff's uncorrected visual acuity was 20/20. *Id.* Because the POHS scarring was stable, Dr. Lewton recommended yearly monitoring. *Id.* According to Dr. Lewton and his expert witness, Dr. Friberg, the only treatment appropriate for the plaintiff's POHS scarring on June 18, 2014, and September 15, 2014, was continued monitoring. *Id.*; Dkt. 96-3, para. 9.

The plaintiff was seen by Dr. Lewton at annual examinations on September 13, 2015, October 5, 2016, and December 6, 2017. Dkt. 96-2, paras. 9-11. The plaintiff's POHS scarring was found to be stable, and he did not have any significant visual problems. *Id.* According to Dr. Lewton and Dr. Friberg, no treatment was required at this time other than continued annual monitoring. *Id.*; dkt. 96-3, para. 9.

At the appointment on December 6, 2017, Dr. Lewton gave the plaintiff a piece of paper on which the words "POHS," "histoplasmosis," and "toxoplasmosis" were written. Dkt. 96-4, pp. 69-71, 98, 105-06, 107. Shortly after this appointment, the plaintiff conducted independent research to educate himself about these conditions. *Id.* at 108-09.

Prior to August 23, 2018, the plaintiff did not require prescription glasses. Dkt. 96-4, p. 97. He experienced a sudden change in his vision on August 23, 2018, with the development of blurry vision in his left eye. *Id.* at 96-97.

On August 23, 2018, the plaintiff submitted a written health care request complaining of blurry vision. Dkt. 96-8, p. 13; dkt. 112-1, para. 8. He was seen by a nurse on August 25, 2018, and scheduled for an appointment to see Dr. Byrd on August 28, 2018. Dkt. 112-1, para. 8. This was the first time that Mr. Hubbard had made any complaints to Dr. Byrd about his vision. *Id.* at para. 9. The plaintiff specifically reported visual distortion and blurriness, saying that he would see "the CBS symbol." Dkt 96-8, pp. 24-36; dkt. 112-1, para. 9.

On August 28, 2018, an official at WVCF sent Dr. Lewton an email informing him about the plaintiff's vision problem. Dkt. 96-2, para. 13. Dr. Lewton was not physically present at WVCF, but he responded to the email that same day, recommending that the plaintiff be seen by a retinal specialist. *Id.*

On August 29, 2018, the plaintiff was evaluated by an ophthalmologist at the Terre Haute Eye Center. Dkt. 96-8, pp. 43-50; dkt. 112-1, para. 10. The diagnosis was "PED" (Pigment epithelia. detachment), indicating the presence of fluid in the layers of the eye, and CNV. *Id.* The ophthalmologist recommended a follow-up with retinal specialist Dr. Sayegh. Dr. Byrd submitted the required paperwork for Mr. Hubbard to receive an urgent referral to see a retinal specialist, which was approved. *Id.*

On August 31, 2018, the plaintiff was sent back to the Terre Haute Eye Center and received an evaluation from retinal specialist Dr. Sayegh. The return paperwork indicated a diagnosis of histoplasmosis with CNV. Dkt. 96-8, pp. 53-57; dkt. 112-1, para. 11. Mr. Hubbard received an eye injection of Avastin, a recommendation for eye drops (gentamicin), and a follow-

7

up in one month regarding the prior injection. *Id.* Dr. Byrd submitted the required paperwork, and the plaintiff was approved for this follow-up in October. *Id.*

On September 19, 2018, the plaintiff had an appointment with Dr. Byrd and complained of ongoing visual distortion. Dkt. 96-8, pp. 59-61; dkt. 112-1, para. 12. The plaintiff expressed concern that his follow-up appointment with Dr. Sayegh had been delayed. *Id.* The complaints of visual distortion were similar to his complaints prior to the initial referrals, and in Dr. Byrd's opinion did not appear to indicate a medical emergency. *Id.* Dr. Byrd did not believe the plaintiff required an immediate referral to the emergency department or to Dr. Sayegh. *Id.* Instead, he felt it was appropriate for the plaintiff to receive the follow-up appointment with Dr. Sayegh that was already scheduled. Dr. Byrd explained his understanding of the plaintiff's diagnosis and treatment plan and assured him that his follow-up appointment had been scheduled. *Id.*

On October 3, 2018, the plaintiff had his next follow-up appointment with Dr. Sayegh. Dkt. 96-8, pp. 64-68; dkt. 112-1, para. 13. At that visit, the diagnosis remained histoplasmosis with CNV, and Mr. Hubbard received another Avastin injection. *Id.* Dr. Sayegh recommended continuing eye drop treatment (gentamicin) and another follow-up in a month. *Id.* Dr. Byrd submitted the required paperwork for the plaintiff to receive eye drops and the one-month follow-up appointment with Dr. Sayegh. *Id.*

On October 17, 2018, Dr. Lewton saw the plaintiff in person for the first time since December 6, 2017. Dkt 96-2, para. 14; dkt. 96-8, p. 68. Dr. Lewton noted that the plaintiff was under the care of a retinal specialist, was receiving Avastin injections in his left eye, and had uncorrected visual acuity of 20/25. *Id.* Dr. Lewton recommended that Mr. Hubbard continue seeing the retinal specialist and that he return to see Dr. Lewton in 3 months for a repeat vision check. *Id.*

On October 31, 2018, the plaintiff was seen by Dr. Byrd for a follow-up appointment. Dkt. 96-8, pp. 73-75; dkt. 112-1, para. 15.. He told Dr. Byrd about the visual problems with his right eye and requested treatment. *Id.* The plaintiff also asked about treatment that could help prevent future visual issues. Dr. Byrd noted that the plaintiff had retinal edema (swelling) in both eyes. *Id.* He also reviewed the medical records and the notes from the plaintiff's most recent referral to Dr. Sayegh. Dr. Byrd informed the plaintiff that he was unsure regarding specific treatment to "prevent" future visual issues, or if he required any treatment for his right eye, as this was outside of Dr. Byrd's area of expertise. *Id.* Dr. Byrd confirmed that the plaintiff had been referred, approved, and scheduled for another follow-up with Dr. Sayegh in the coming days, where he could address these issues and receive any necessary treatment. *Id.*

On November 6, 2018, Mr. Hubbard had another follow-up with Dr. Sayegh. Dkt. 96-8, pp. 78-91; dkt. 112-1, para. 16. Dr. Sayegh's notes indicate a diagnosis of retinal edema, with an Avastin injection during this visit. *Id.* The recommendation was for continued eye drops, a one-month follow-up, and a return visit the following day for an Avastin injection in the right eye. *Id.* Dr. Byrd submitted all necessary paperwork for the plaintiff to receive a visit the following day for the injection in the right eye and a one-month follow-up appointment. *Id.*

On November 7, 2018, the plaintiff was sent offsite for an Avastin injection in his right eye. Dkt. 96-8, p. 92; dkt. 112-1, para. 17.

On December 4, 2018, the plaintiff was sent to Dr. Sayegh where he received Avastin injections. Dkt. 96-8, pp. 110, 107-09; dkt. 112-1, para. 18. Dr. Sayegh recommended a one-month follow-up for further evaluation and treatment. *Id.* Dr. Byrd submitted all necessary paperwork for approval and scheduling of the one-month follow-up. *Id.*

The plaintiff returned to see Dr. Lewton on December 19, 2018, at which time Dr. Lewton found Mr. Hubbard's visual acuity to be 20/25, uncorrected. Dkt. 96-2, p. 14; dkt. 96-8, p. 104.

Over the course of the next several months, Mr. Hubbard continued to receive monthly visits with Dr. Sayegh and the Terre Haute Eye Center, where he received Avastin injections. Dkt. 112-1, para. 19.

4. Grievances for Alleged Lack of Medical Treatment

On or around September 24, 2018, Ms. Hobson was copied on an email requesting feedback about an informal medical grievance submitted by the plaintiff. Dkt. 112-2, para. 6. Ms. Hobson does not typically get involved in responses to "informal" requests. *Id.* Instead, that duty falls on either the Director of Nursing or other medical staff as needed or requested by IDOC. Dkt. 112-1, para. 5; dkt. 112-5, p. 18.. *Id.* Ms. Hobson does not recall receiving any letters regarding the plaintiff's medical treatment before September 24, 2018. *Id.*

On October 2, 2018, and October 11, 2018, Ms. Hobson was asked to respond to the plaintiff's formal medical grievances requesting treatment for histoplasmosis of the eye. Dkt. 112-2, para 7; dkt. 112-5, pp. 7, 14, 15. Ms. Hobson reviewed the plaintiff's medical chart and determined he had been evaluated onsite by Dr. Byrd and Dr. Lewton and off-site by an ophthalmologist and a retinal specialist. Dkt. 112-2, para. 8; dkt. 112-5, pp. 18, 20. She also determined the plaintiff was receiving onsite treatment in accordance with the specialist's recommendations and was scheduled for follow-up appointments with the off-site specialist. Ms. Hobson told the grievance specialist that based upon her review of the records, she believed the plaintiff's care and treatment had been appropriate. *Id.*

On or around October 4, 2018, defendant Amy Wright was asked to investigate and respond to the plaintiff's informal grievance describing new symptoms and requesting treatment.

10

Dkt. 112-3, para. 5; dkt. 112-5, p. 39. Ms. Wright reviewed the plaintiff's medical records and determined that he had been referred and sent outside the facility for an evaluation by an ophthalmologist the previous day. *Id.* Ms. Wright also saw that recommendations were made by this physician, and that Plaintiff was receiving treatment. *Id.* She then told the grievance specialist that the plaintiff had been seen the day before and received treatment, including an antibiotic eye drop. *Id.*

On or around October 8, 2018, Ms. Hobson was asked to respond to another formal grievance, which the plaintiff had originally submitted in September, regarding new ocular symptoms. Dkt. 112-2, para. 9; dkt. 112-5, pp. 47, 50. Ms. Hobson reviewed the records and noted that the plaintiff had been evaluated by Dr. Byrd on September 19, 2018, and had been referred to an off-site ophthalmologist a few days earlier for treatment. *Id.* As such, Ms. Hobson sent a response indicating that the plaintiff had already been approved for his next follow-up appointment, and that his care and treatment had been appropriate. *Id.*

On October 26, 2018, Ms. Wright was asked to investigate the plaintiff's medical requests. Dkt. 112-3, para. 6; dkt. 112-5, p. 96. Ms. Wright told the grievance specialist that the plaintiff's medical condition was one that could not be treated onsite, that the plaintiff had an upcoming appointment with an offsite specialist, and that he should receive a yellow copy of his health care request in the mail. *Id.*

On or around November 21, 2018, Ms. Hobson was asked to respond to the plaintiff's formal grievance regarding a lack of treatment for vision loss and other symptoms in his right eye in October 2018. Dkt. 112-2, para. 10; dkt. 112-5, pp. 72-81. Ms. Hobson reviewed the records and determined that the plaintiff had been assessed onsite by Dr. Byrd on October 31, 2018, and referred to an off-site specialist in November. *Id.* The specialist gave the plaintiff an injection in

11

his right eye and recommended that the medical staff on-site administer eye drops. *Id.* Ms. Hobson told the grievance specialist that the plaintiff had received treatment and that medical staff were following the recommendations of the plaintiff's offsite specialist. *Id.*

5. <u>Warden Richard Brown and WVCF Policy</u>

According to Warden Brown, there is no express policy at WVCF that offender medical care should be delayed or that offenders should not be sent to outside specialists in an effort to cut costs. Dkt. 104-1, para. 9.

Warden Brown's role, as it pertains to offender health services, is limited to ensuring transportation and security for offenders who may have outside medical appointments, procedures, or hospital stays. *Id.* at para. 7. Warden Brown is not a doctor, medical professional, or member of the medical staff at WVCF. *Id.* at para. 6. Warden Brown defers to contracted health care professionals, presently Wexford of Indiana, LLC, to make all decisions regarding appropriate medical treatment for offenders. *Id.* at para. 4. IDOC policy requires that all matters involving clinical judgment shall be reserved to medical staff. *Id.* at para. 5. Warden Brown is not authorized or trained to instruct any member of the medical staff to begin, change, or cease treatment for any medical condition complained of by an offender. *Id.* at para. 8.

Warden Brown is not the final decision-maker regarding the plaintiff's medical care or scheduling the plaintiff for appointments with an outside specialist. *Id.* at paras. 10, 11. Warden Brown is not the final decision-maker as it relates to medical policy within IDOC or WVCF. *Id.* at para. 12.

As it relates to the plaintiff's request for medical care, Warden Brown did not take any action to delay the plaintiff's medical treatment or take any action to prevent the plaintiff from accessing an outside medical specialist. *Id.* at para. 13.

### III. Discussion

The plaintiff asserts Eighth Amendment medical care claims against the defendants. At all times relevant to the plaintiff's claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotations omitted). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford*

*Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

   1. Dr. Lewton

The undisputed evidence establishes that medical professionals often wait to treat patients with histoplasmosis of the eye until the condition begins to cause vision loss, retinal edema, or CNV. Until one or more of these symptoms arise, annual monitoring is recommended. All treatments for histoplasmosis—including surgery, eye injections, and laser procedures—carry significant risks. The wait-and-see approach is preferred, at least in part, because of these risks.

Dr. Lewton diagnosed the plaintiff with histoplasmosis on June 14, 2014. At a follow-up appointment approximately three months later, Dr. Lewton monitored the plaintiff's condition and noted that it was stable. He recommended and performed annual examinations for the next three years. When Dr. Lewton was told, by email, that the plaintiff had developed vision loss, he responded the same day and recommended that the plaintiff be taken to a retinal specialist "sooner rather than later." Dkt. 96-8, p. 19.

In the plaintiff's response to Dr. Lewton's motion for summary judgment, he claims that on June 14, 2014, Dr. Lewton "screened [the plaintiff's] eyes and drew four (4) lines on the eye

14

diagram representing four (4) new blood vessels and noted, POHS scars." Dkt. 115, p. 1 (citing dkt. 115-1, p. 46; dkt. 96-8, p. 5). Dr. Lewton emplains in reply that the plaintiff's claim is based on an incorrect interpretation of Dr. Lewton's notes from the appointment. Dkt. 118, p. 2. He has provided an affidavit explaining that the four lines represent "branch retinal arteries, which are normal, and present, on the retinas of all persons with normal eyesight." Dkt 118-1, p. 3.

The notes from the June 14, 2014, appointment do not mention CNV. Dkt. 96-8, p. 5. Dr. Lewton wrote "POHS scars" next to the diagram in question but did not mention the proliferation of new blood vessels. *Id.* These notes, when read in conjunction with Dr. Lewton's explanatory affidavit, establish that there is no evidence in the record that Dr. Lewton ignored the presence of CNV, retinal edema, or vision loss at any of the plaintiff's optometry appointments.

There is no evidence in the record supporting a conclusion that Dr. Lewton was deliberately indifferent to the plaintiff's serious medical condition. Accordingly, Dr. Lewton's motion for summary judgment, dkt. [95], is **granted**.

2. Dr. Byrd

The undisputed evidence establishes that Dr. Byrd lacked sufficient training and experience to effectively treat the plaintiff's retinal edema, CNV, and vision loss on his own. Instead, he approved the plaintiff's medical appointments with onsite and offsite specialists and approved orders for onsite treatment consistent with the specialists' recommendations. The plaintiff's argument that Dr. Byrd delayed his referral to an outside specialist for four years is based on the unsupported conclusion, discussed above, that Dr. Lewton discovered CNV in plaintiff's eyes on June 14, 2014.

To the extent that plaintiff alleges his vision loss was caused by a temporary discontinuation of hypertension medication in November 2013, there is no evidence that a few

15

days of missed medication in 2013 caused the plaintiff to develop CNV almost five years later in August 2018.

There is no evidence supporting the plaintiff's claims that Dr. Byrd was deliberately indifferent to the plaintiff's serious medical condition within the statute of limitations. Accordingly, Dr. Byrd's motion for summary judgment, dkt. [110], is **granted**.

3. Amy Wright

Ms. Wright reviewed and responded to two informal grievances submitted by the plaintiff in the fall of 2018. When she reviewed the first informal grievance, she learned that the plaintiff had been seen by an offsite specialist the day before. When she reviewed the second informal grievance, she learned that the plaintiff had been attending regular appointments with physicians onsite and offsite and that his course of treatment was being determined by a specialist.

As a nurse whose job duties are primarily administrative in nature, Ms. Wright was entitled to defer to the plaintiff's primary care doctor and retinal specialist about his course of treatment. *Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir 2006) (finding it proper for health care unit administrator—who was also a nurse—to defer to a physician's diagnosis); *but see Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurses may not blindly defer to a physician's "inappropriate or questionable practice."). There is no evidence that Ms. Wright was confronted with inappropriate or questionable practices on the part of the plaintiff's physicians here, or that she was otherwise deliberately indifferent to the plaintiff's serious medical needs. Accordingly, Ms. Wright's motion for summary judgment, dkt. [110], is **granted**.

4. Kim Hobson

Ms. Hobson reviewed and responded to the plaintiff's formal medical grievances in the fall of 2018. Each time she reviewed a formal grievance, she learned that the plaintiff had been attending regular appointments with physicians onsite and offsite and that plaintiff's course of treatment was being determined by a specialist. Like Ms. Wright, there is no evidence that Ms. Hobson was confronted with inappropriate or questionable practices on the part of the plaintiff's physicians, or that she was otherwise deliberately indifferent to plaintiff's serious medical needs. Accordingly, Ms. Hobson's motion for summary judgment, dkt. [110], is **granted**.

5. Wexford of Indiana

A corporation acting under color of state law, like Wexford of Indiana, may be liable under § 1983 if it maintains an express policy or widespread practice that caused an unconstitutional deprivation. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002); *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-59 (7th Cir. 2004). Because the plaintiff did not suffer a constitutional deprivation, Wexford of Indiana cannot be held liable for maintaining an unconstitutional policy or practice. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 505 (7th Cir. 2010). Accordingly, Wexford of Indiana's motion for summary judgment, dkt. [110], is **granted**.

6. Warden Brown

The plaintiff alleges claims against Warden Brown in his individual and official capacity. To survive summary judgment on the individual capacity claim, the plaintiff must present evidence that Warden Brown was personally involved in an unlawful delay in his medical treatment. "*Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). There is no evidence that Warden Brown personally denied or delayed the plaintiff's medical treatment. To the extent Warden Brown

was aware of the plaintiff's complaints about delayed medical treatment, as a non-medical professional he also was entitled to rely on the professional judgment of the medical staff at WVCF. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants . . can rely on the expertise of medical personnel.").

To survive summary judgment on an official capacity claim, the plaintiff must present evidence that Warden Brown maintained an explicit policy or oversaw a widespread practice or custom that caused the plaintiff to suffer an unlawful deprivation of his right to medical care. *Palmer v. Marion County*, 327 F.3d 588, 594-95 (7th Cir. 2003). Because the plaintiff did not suffer a constitutional deprivation, Warden Brown cannot be held liable for maintaining an unconstitutional policy or practice. *Sallenger*, 630 F.3d at 505. Accordingly, Warden Brown's motion for summary judgment, dkt. [103], is **granted**.

## IV. Conclusion

For the reasons explained above, the defendants' motions for summary judgment, dkts. [95], [103], and [50], are **granted**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED**.

Date: 6/23/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

WILLIAM HUBBARD
945818
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Alex Maurice Beeman
REMINGER CO. LPA (Indianapolis)
abeeman@reminger.com

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

David C. Dickmeyer
INDIANA ATTORNEY GENERAL
David.Dickmeyer@atg.in.gov

Ronald A. Mingus
REMINGER CO. LPA (Indianapolis)
rmingus@reminger.com

Robert Lewis Yates
INDIANA ATTORNEY GENERAL
Robert.yates@atg.in.gov